FILED

OCT 29 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. CC-14-1193-DTaKu |
| ALTERNATIVE GRAPHICS, INC., | Bk. No. 9:12-bk-11378 |
| Debtor. | |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| ALTERNATIVE GRAPHICS, INC., | |
| Appellee. | |

Argued and Submitted on September 24, 2015
at Malibu, California

Filed - October 29, 2015

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Robin L. Riblet,[2] Bankruptcy Judge, Presiding

Appearances:     Amanda Nichole Ferns of Ferns, Adams & Associates argued for Appellant; William Charles Beall of Beall & Burkhardt argued for Appellee.

Before: DUNN, TAYLOR AND KURTZ, Bankruptcy Judges.

---

[1]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

[2]On May 9, 2014, the bankruptcy case was reassigned to the Honorable Peter Carroll.

Creditor Hewlett-Packard Financial Services Company ("HP Financial") appeals from the bankruptcy court's order confirming the Debtor's chapter 11 plan of reorganization.[3] Specifically, HP Financial takes issue with the following: 1) the confirmed plan's characterization of HP Financial's claim; 2) the amount to be paid to HP Financial under the confirmed plan; and 3) the court's denial of HP Financial's motions to alter or amend previous orders awarding sanctions to the Debtor. We DISMISS AS EQUITABLY MOOT the aspects of the appeal concerning plan confirmation generally and the characterization of HP Financial's agreement with the Debtor. Otherwise, we AFFIRM.

## I. FACTUAL BACKGROUND

This appeal arises from a dispute involving a creditor who, in the words of the bankruptcy court, "has been fighting tooth and nail every inch to try and prevent the Debtor from getting documents" requested in discovery.

The discovery dispute arose out of a disagreement between the Debtor and creditor HP Financial as to the nature of a transaction between the parties in 2007. The Debtor acquired a piece of printing equipment from HP Financial. HP Financial maintains that it leased the equipment to the Debtor, whereas the Debtor contends (and the bankruptcy court found) that the

---

[3]Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure. All "Civil Rule" references are to the Federal Rules of Civil Procedure. The Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California are referred to as "Local Bankruptcy Rule" or "LBR."

transaction was documented as a lease but was actually intended as a security arrangement for a sale.

As explained below, this disagreement was the only issue in need of resolution before the Debtor's chapter 11 plan could be confirmed. Unfortunately, that resolution was delayed six months while the parties waged a heated battle over the Debtor's discovery requests and HP Financial's responses.

The Indigo 5500

The Debtor, Alternative Graphics, Inc., is a corporation operating a commercial printing business in Goleta, California. In December 2007, the Debtor acquired an HP Indigo 5500 digital printing press (the "Indigo 5500") from HP Financial, a subsidiary of Hewlett-Packard, Inc. ("HP Inc."). HP Financial, in turn, had acquired the Indigo 5500 from Indigo America, Inc. ("Indigo America"), also a subsidiary of HP Inc., for $350,000.00. The transaction was governed by a so-called Master Lease and Financing Agreement ("Master Agreement").

The Master Agreement, together with its attached schedule, provided that the value of the Indigo 5500 was $337,002.00. The Debtor was to pay HP Financial $6,517.00 monthly for 60 months, for a total of $391,020.00. At the end of the 60-month term, the Debtor could purchase the Indigo 5500 for an amount equal to its fair market value at that time.

The Chapter 11 Case

On April 2, 2012, the Debtor filed a petition for reorganization under chapter 11. The Debtor's amended plan of reorganization ("Plan") listed the claim of HP Financial as a

3

secured claim, with the collateral being the Indigo 5500.[4] The Plan proposed to pay HP Financial a total of $90,000.00, plus interest, which the Debtor asserted was the value of the Indigo 5500 as of the filing date. HP Financial objected to the plan, arguing that the Debtor had mischaracterized its claim. More specifically, HP Financial objected to its treatment as a secured creditor, arguing that its status under the Master Agreement was that of a lessor. HP Financial asserted that it held an unsecured claim in the amount of $272,219.33 and that the correct value of the Indigo 5500 was $250,000.00.[5] A hearing on confirmation of the Plan was set for November 14, 2013.

---

[4]HP Financial did not include the Plan in its appendix or excerpts of record. In fact, this is only one of the significant omissions in the appendix and excerpts filed by HP Financial. For example, the excerpts of record include only portions of the transcript of the hearing on Plan confirmation. We have exercised our discretion to take judicial notice of documents filed in the Debtor's main bankruptcy case, including the Plan and the full transcript of the confirmation hearing. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1988); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003). The Debtor filed supplemental excerpts of record but declined to file the missing portions of the confirmation hearing transcript, not wishing to waive its request for summary affirmance on the basis of an inadequate record. We decline the request.

[5]According to HP Financial's amended proof of claim, $99,801.89 of its claim was attributable to "Costs (attorney's fees, late charges, other costs)." Counsel for HP Financial later conceded that this number was a "typo," and that the correct figure was $9,981.89, approximately a tenth of the originally stated amount. No further amendment to the proof of claim was made.

4

The Discovery Dispute

On August 14, 2013, the Debtor served HP Financial with a request for production of documents and a set of interrogatories.[6] These discovery requests were aimed at establishing the true nature of the Master Agreement. The Debtor requested documents and information concerning any leases HP Financial had executed with other customers involving equipment similar or identical to the Indigo 5500. Specifically, the Debtor wanted to know: the prices paid by any customers to acquire their presses at the end of their lease terms; the prices for which such used presses had been sold to third parties; the amount HP Financial had charged its customers to remove presses if the customer did not wish to purchase at the end of the lease term; HP Financial's expectations at the outset of its agreements as to the equipment's value at the end of the lease term; and other related matters.

On September 23, 2013, after requesting and receiving an extension of time to respond to the first set of discovery requests, counsel for HP Financial submitted responses. HP Financial objected that the requests were ambiguous, overly broad, burdensome and oppressive, and that the requests assumed facts not in evidence and were not calculated to lead to the production of admissible evidence. Aside from those very general objections, HP Financial's responses were perfunctory. It

---

[6]These discovery requests were made in the context both of confirmation proceedings with respect to the debtor's initial plan of reorganization and a relief from stay motion filed by HP Financial.

produced only one document, a copy of the Master Agreement, which the Debtor already possessed.

In addition to its general objections, HP Financial also refused to provide any documents in the possession of HP Inc. or Indigo America.

The First Motion to Compel

On Tuesday, September 24, 2013, The Debtor's attorney, William Beall, e-mailed HP Financial's attorney, Amanda Ferns. Mr. Beall complained that HP Financial's responses were insufficient and threatened to file a motion to compel discovery unless Ms. Ferns called him within one day to discuss the situation. Ms. Ferns responded by e-mail on Wednesday evening, September 25, 2013, stating her willingness to meet and confer with Mr. Beall by telephone, but asking for more specific information regarding the Debtor's grievances. The following morning, Mr. Beall replied by e-mail, providing further details and stating that he planned to telephone Ms. Ferns the next day, Friday, September 27, 2013.

What happened next is a matter of some dispute. Mr. Beall declared that he called Ms. Ferns' office "within normal business hours" on Friday, September 27th, and left a voice mail. Ms. Ferns stated in her declaration that she did not receive Mr. Beall's voice mail until Monday, September 30th. What is undisputed is that at 3:26 p.m. on September 30, 2013, the Debtor filed a motion to compel discovery and for sanctions ("First Motion to Compel"). Ms. Ferns stated that the First Motion to Compel was filed "before [she] was able to return Mr. Beall's telephone call[.]" Mr. Beall retorted that he did not begin

6

working on the First Motion to Compel until Monday morning, September 30th, and that Ms. Ferns could have called him at any time before 3:26 p.m.

In the First Motion to Compel, the Debtor argued that the First Discovery Responses were so inadequate that the bankruptcy court should treat HP Financial as if it had not responded at all. The Debtor requested sanctions, in the form of either attorney fees or terminating sanctions, i.e., prohibiting HP Financial from voting against or objecting to the Plan. In response, HP Financial argued that the First Motion to Compel was procedurally defective, citing Local Bankruptcy Rule ("LBR") 7026-1. Under LBR 7026-1, HP Financial argued, Mr. Beall was required to send Ms. Ferns a letter requesting a meeting to resolve the discovery dispute and detailing the discovery order to be sought. If Ms. Ferns failed to respond within seven days, only then could the Debtor file a motion to compel. HP Financial also argued that its discovery responses had been sufficient in any event.

The bankruptcy court held a hearing on the First Motion to Compel on October 11, 2013. At the outset of the hearing, the bankruptcy court agreed with HP Financial that the First Motion to Compel was procedurally improper. Nevertheless, the court proceeded with the hearing in the hope of avoiding delay of the November 14 Plan confirmation hearing. The bankruptcy court rejected the argument that HP Financial could not obtain records from HP Inc. or Indigo America, because, as counsel for HP Financial conceded, HP Financial and Indigo America are subsidiaries and affiliates of HP Inc. The bankruptcy court gave

7

HP Financial until November 1, 2013 to supplement its discovery responses.

After announcing its rulings on the record at the October 11, 2013 hearing, the bankruptcy court entered an order on October 31, 2013 ("First Discovery Order"). In the First Discovery Order, the bankruptcy court denied the Debtor's request for sanctions without prejudice due to the failure to comply with LBR 7026-1. Consistent with the bankruptcy court's oral rulings, the First Discovery Order stated that HP Financial's objections were overruled and that HP Financial was required to respond to discovery requests to which it had not already responded satisfactorily.

On November 14, 2013, HP Financial filed a motion to alter or amend the First Discovery Order ("First Motion to Alter"). HP Financial requested alteration of the First Discovery Order based on purportedly new evidence on two points:

(1) HP Financial could not search its files by asset, making it impossible to find previous leases of equipment similar or identical to the Indigo 5500. In an attached declaration, HP Financial's representative Cindy Roebuck asserted that HP Financial had entered into some 62,000 lease agreements in North America since July 2013. Ms. Roebuck stated that it would take "thousands of hours" for HP Financial to find the requested documents.

(2) HP Financial did not have custody or control over documents belonging to HP Inc. or Indigo America. Ms. Roebuck declared that HP Financial was a subsidiary of HP Inc., but nevertheless Ms. Roebuck had received no response to her efforts

8

at communication with HP Inc.

Due to HP Financial's failure to comply with the bankruptcy court's calendaring procedures, the First Motion to Alter was not set for hearing.

The Second Motion to Compel

Three days after the hearing on the First Motion to Compel, the Debtor served HP Financial with a second set of interrogatories and requests for production of documents. The Debtor requested all invoices and other communications between and among HP Financial, HP Inc. and Indigo America regarding HP Financial's acquisition of the Indigo 5500, as well as all accounting documents regarding the Debtor's account.

The November 1 deadline came and went without any additional responses by HP Financial. On November 12, 2013, HP Financial submitted supplemental responses to the first round of discovery. The supplemental responses contained some new information, but HP Financial repeated its overruled objections regarding burden, relevance and lack of custody or control of documents and refused to provide substantive responses to most of the requests. One significant addition was an appraisal of the Indigo 5500 performed at HP Financial's request by an appraiser named Steven Hjelmstrom. Mr. Hjelmstrom valued the Indigo 5500 at $173,100.00. On November 15, 2013, HP Financial submitted its responses to the second set of discovery requests.

Throughout November, Mr. Beall and Ms. Ferns met and conferred regarding the Debtor's continuing dissatisfaction with HP Financial's various discovery responses. On December 4, 2013, the Debtor filed a second motion to compel discovery and for

9

sanctions ("Second Motion to Compel"). The Debtor again requested monetary sanctions and terminating sanctions in the form of an order deeming HP Financial to have consented to confirmation of the Plan.

The bankruptcy court held a hearing on the Second Motion to Compel on January 29, 2014. After the bankruptcy court overruled HP Financial's objections based on burdensomeness and relevance, counsel for HP Financial explained that, after "months" of effort, HP Financial had obtained a number of the requested lease agreements with other customers. After prolonged colloquy, the bankruptcy court ordered HP Financial to comply with "each and every" discovery request, to the extent it had not done so previously.

The court entered an order ("Second Discovery Order") granting the Second Motion to Compel, overruling HP Financial's objections and requiring HP Financial to respond to all discovery requests. The Second Discovery Order also required HP Financial to pay the Debtor's reasonable attorney fees incurred in the filing and prosecution of the First and Second Motions to Compel. The Debtor was to file a declaration setting forth such fees, after which HP Financial would have "two calendar weeks" in which to object. On February 4, 2014, the Debtor filed a declaration of Mr. Beall ("Fee Declaration"), with an attached itemization of his fees in the amount of $16,965.00. The court entered an order ("Fee Order") on February 18, 2014, requiring HP Financial to pay the amount set forth in the declaration.

That evening, after the Fee Order had been entered, HP Financial filed an objection to the Fee Declaration.

10

Specifically, HP Financial objected to the inclusion in the Fee Order of fees incurred in connection with the First Motion to Compel, the Motion to Alter, the Debtor's review of discovery responses, and the Debtor's motion to continue the confirmation hearing.

Shortly before midnight the same night, HP Financial filed a motion to alter or amend the Second Discovery Order ("Second Motion to Alter"). HP Financial argued that it was inappropriate for the Second Discovery Order to impose sanctions that had been requested in the First Motion to Compel but denied in the First Discovery Order. Under this argument, the bankruptcy court should have awarded sanctions, if at all, only in connection with the Second Motion to Compel.

On March 4, 2012, HP Financial filed yet another motion to alter or amend ("Third Motion to Alter"), this time seeking reconsideration of the Fee Order. For the most part, the Third Motion to Alter raised the same arguments as the Second Motion to Alter regarding the impropriety of the fees requested. Apart from those matters, however, HP Financial now argued that the Fee Order should be altered because it was entered one day too early. The Beall Declaration was filed on February 4, and the Second Discovery Order provided that HP Financial would have "two calendar weeks" in which to respond; therefore, HP Financial argued, the Fee Order should not have been entered before February 19. HP Financial asked the bankruptcy court to alter or amend the Fee Order to take into account HP Financial's objection, which was filed within the allowed two-week period. As with the two previous motions to alter or amend, the Third

11

Motion to Alter was not set for hearing.

The Confirmation Hearing

The bankruptcy court held an evidentiary hearing regarding confirmation of the Plan ("Confirmation Hearing"). The bankruptcy court heard testimony from Mr. Hjelmstrom, the appraiser who had performed an appraisal of the Indigo 5500 at HP Financial's request. Mr. Hjelmstrom testified consistent with his report that the value of the Indigo 5500 was $173,100.00. This was based on a "desktop appraisal," which means an appraisal based on photographs and interviews rather than physical inspection. Mr. Hjelmstrom said the valuation he performed was "fair market value in place," which is higher than other valuations because it takes into account the fact that the equipment is already installed and in use. Mr. Hjelmstrom explained his process for arriving at a valuation:

(1) He began with the selling price of a refurbished unit equivalent to the Indigo 5500.

(2) He then reduced that figure to reflect that the Indigo 5500 had not been refurbished.

(3) He added "in-place costs;" that is, he increased his valuation to account for the fact that the Indigo 5500 was already in place and therefore more valuable than a unit that would require transportation and installation.

(4) He considered two forms of obsolescence: functional and economic. Functional obsolescence is a matter of whether the equipment was functionally out of date. Economic obsolescence applies when a piece of equipment is non-compliant with applicable regulations and is thus no longer usable.

12

Mr. Hjelmstrom determined that neither of these applied to the Indigo 5500.

On cross-examination, Mr. Hjelmstrom admitted that he had not examined the Indigo 5500 or any other presses of that model. Mr. Hjelmstrom also testified that he had not considered comparable sales in general or sales by HP Inc. of previously leased machines in particular; he had investigated only the **asking prices** on equipment offered for sale by various sellers. With regard to the sales by HP Inc., Mr. Hjelmstrom explained that such sales are relevant to "orderly liquidation value," but irrelevant to determining fair market value in place. Mr. Hjelmstrom further acknowledged that, although the Indigo 5500 was not yet functionally obsolete, the model was no longer in production and would "soon" be a "white elephant."

The bankruptcy court also admitted into evidence a number of exhibits, including a document produced by HP Financial showing a history of sales of Indigo 5500 printers to customers at the end of their lease terms. For each transaction, this document showed the date on which the lease term had begun, a date labeled "BO," which all parties agreed stood for "buyout," and a price also designated "BO."

After argument and colloquy, the bankruptcy court announced its findings of fact and conclusions of law. The court found that Mr. Hjelmstrom's appraisal value was too high, and that the better method to determine the value of the Indigo 5500 was to consider the previous lease buyouts. Considering only the lease buyouts of five-year-old Indigo 5500 presses, the court calculated that the average price was approximately $45,000. The

court then found, based on Mr. Hjelmstrom's testimony regarding in-place costs, that the cost to return the equipment under the Master Agreement would have been $25,000. In light of these calculations, the court found that HP Financial could not reasonably have expected to receive anything more than minimal value at the end of the term of the Master Agreement. The court further found that "it would not make any sense under the circumstances of this case for the Debtor to pay $25,000 to send the [Indigo 5500] back rather than $45,000 to keep it." On that basis, the court concluded that the Master Agreement was a security agreement under applicable law. Even though the value of the Indigo 5500 was determined to be $45,000, the bankruptcy court concluded that the Debtor was "stuck with" the $90,000 value stated in the Plan.

On April 15, 2014, the bankruptcy court entered an order consistent with its rulings at the Confirmation Hearing ("Confirmation Order"). In addition to confirming the Plan, the Confirmation Order contained language denying HP Financial's relief from stay motion and the Second and Third Motions to Alter. HP Financial filed a timely notice of appeal but did not seek a stay of the Confirmation Order pending appeal. Since the Confirmation Order was entered, the Debtor has proceeded to make payments as required under the Plan. Among the priority unsecured creditors, some are employees owed vacation time, some of whom elected to take the vacation time in lieu of payment. Other unsecured creditors are customers of the Debtor, some of whom elected to accept payment in kind, in the form of free printing services, instead of cash distributions.

14

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). Except as otherwise stated below, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Whether this appeal is moot insofar as HP Financial seeks reversal of confirmation of the Plan.

2. Whether the bankruptcy court erred in finding that the Master Agreement was in the nature of a security agreement rather than a true lease.

3. Whether the bankruptcy court clearly erred in its valuation of the Indigo 5500.

4. Whether the bankruptcy court abused its discretion in awarding monetary sanctions to the Debtor.

## IV. STANDARDS OF REVIEW

We review our own jurisdiction, including questions of mootness, de novo. Ellis v. Yu (In re Ellis), 523 B.R. 673, 677 (9th Cir. BAP 2014). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Bronitsky v. Bea (In re Bea), 533 B.R. 283, 285 (9th Cir. BAP 2015). The bankruptcy court's imposition of sanctions for discovery abuse is reviewed for abuse of discretion. Pham v. Golden (In re Pham), 536 B.R. 424, 430 (9th Cir. BAP 2015); Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1156 (9th Cir. 2003). We review the bankruptcy court's decision to confirm a chapter 11 plan for an abuse of discretion. Marshall v. Marshall (In re Marshall), 721 F.3d 1032, 1045 (9th Cir. 2013).

A bankruptcy court abuses its discretion if it applies an

15

incorrect legal standard or misapplies the correct legal standard, or if its factual findings are illogical, implausible or unsupported by evidence in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011). Only if the bankruptcy court did not apply the correct legal standard or improperly applied it, or if its fact findings were illogical, implausible, or without support in inferences that can be drawn from facts in the record, is it proper to conclude that the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

We may affirm the decision of the bankruptcy court on any basis supported by the record. See ASARCO, LLC v. Union Pac. R. Co., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

V. DISCUSSION

A.   Mootness

The doctrine of equitable mootness counsels that an appellate body should dismiss an appeal where "a 'comprehensive change of circumstances' has occurred so 'as to render it inequitable for this court to consider the merits of the appeal.'" Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 880 (9th Cir. 2014) (quoting Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793, 798 (9th Cir. 1981)). This doctrine exists to protect the finality of bankruptcy decisions, particularly where the rights of third parties are implicated. Id. The Ninth Circuit follows a four-step process to determine whether an appeal from an order confirming a chapter 11 plan is equitably

16

moot:

> [1] We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights.  [2] If a stay was sought and not gained, we then will look to whether substantial consumation of the plan has occurred.  [3] Next, we will look to the effect a remedy may have on third parties not before the court.  [4] Finally, we will look at whether the bankruptcy court can fashion effective relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

Id. at 881; JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props., Inc. (In re Transwest Resort Props., Inc.), 801 F.3d 1161(9th Cir. 2015).

### 1.    HP Financial's failure to seek a stay

Here, HP Financial did not seek a stay pending appeal and has thus "flunked the first step."  In re Roberts Farms, Inc., 652 F.2d at 798.  Granted, the Ninth Circuit has not held that an appeal of this sort is **always** moot if the appellant fails to seek a stay.  See Rev Op Grp. v. ML Manager LLC (In re Mortgs. Ltd.) ("Mortgages I"), 771 F.3d 1211, 1216 (9th Cir. 2014) (noting "tension" in Ninth Circuit authorities concerning this issue). Therefore, consideration of the remaining steps is appropriate.

### 2.    Substantial consummation of the Plan

The Code defines substantial consummation as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property to be dealt with by the plan; and
> (C) commencement of distribution under the plan.

17

11 U.S.C. § 1101(2). The transfers of property referred to in subsection A do not include "payments to creditors in satisfaction of the debtor's debts." Rev Op Grp. v. ML Manager LLC (In re Mortgs. Ltd.) ("Mortgages II"), 771 F.3d 623, 628 (9th Cir. 2014). Rather, such payments are "distributions" under subsection C. Id. The significance of this distinction is that payments to creditors must merely have "commenced" for a reorganization plan to be substantially consummated.

Here, the reorganized Debtor has assumed the business of Alternative Graphics, Inc. No other transfers of property were proposed by the Plan. The Debtor has paid all tax claims and one of two administrative claims in full, while its other administrative claim continues to be paid. The Debtor also has made ongoing monthly payments to its only secured creditor, HP Financial. Holders of priority claims, all of whom are the Debtor's employees, have been paid either in full or in kind. General unsecured creditors who elected to receive printing services rather than cash distributions have received those services. Finally, the first and second semiannual distributions to general unsecured creditors who elected not to receive services in kind have been made. In short, distributions have commenced, and the plan has been substantially consummated.

3. The third and fourth steps

The third and fourth steps of the Thorpe Insulation analysis require us to consider what relief can be accorded if we consider the merits of this appeal. Step three involves a consideration of the effects on third parties of any available remedy, and step four involves the related question of whether such remedy would

18

create a difficult and essentially unmanageable situation at the bankruptcy court. Both of these questions in turn depend on the nature of the relief that would be available.

To the extent HP Financial takes issue with Plan confirmation itself, any effective relief that might be granted would inequitably harm the interests of third parties and would "knock the props out from under the [P]lan." If we reverse confirmation, there will be no viable way to claw back distributions that already have been made under the Plan, particularly where employees elected to take vacation time in lieu of payment and where other creditors received payment in kind in the form of free printing services. Reversal would be both prejudicial to these third parties and unmanageable in the bankruptcy court on remand. Furthermore, since HP Financial ultimately seeks return of the Indigo 5500, the prospect of any future confirmable plan might be in jeopardy, which would make the situation still more unmanageable for the court and third parties. For these reasons, we decline to consider setting aside Plan confirmation as equitably moot.[7]

_____

[7]We note also the following ambiguous exchange between counsel for HP Financial and the court that took place near the end of the Confirmation Hearing, after the court had announced its decision:

> MS. FERNS: As it stands, we do not object to the plan. We withdraw our objection.
>
> THE COURT: You withdraw your objection to the plan?

(continued...)

The same rationale applies to the bankruptcy court's determination that the Master Agreement created a security interest rather than a lease. If this decision were reversed, it would not only knock the props out from under the plan by casting doubt on the Debtor's right to retain the Indigo 5500, but it would also upset the plan's treatment of unsecured creditors by adding HP Financial's very large claim for lease payments as an unsecured claim. Again, we decline to consider the merits of this issue as equitably moot.

The issue of the valuation of the Indigo 5500, on the other hand, presents a less clear case for mootness. Were we to remand to the bankruptcy court on this issue, it might be possible to craft relief in the form of modification of the Plan. The bankruptcy court could simply augment the amount to be paid to HP Financial under the Plan, which would result in a longer

---

[7](...continued)
> MS. FERNS: Well, the objection has been --
>
> THE COURT: Okay.
>
> MS. FERNS: -- I -- you know, I mean, I -- the Court has determined that it's not a lease, we're sticking with the 90,000 --
>
> THE COURT: Okay.
>
> MS. FERNS: -- we agree with the plan. . . .

Hr'g Tr. (Apr. 11, 2014) at 157:17-158:1.

At oral argument, Debtor's counsel argued that this colloquy provides an additional ground for affirmance. Because we do not consider setting aside confirmation of the Plan, we do not otherwise address this argument.

duration before the claim is paid off but would have no impact on distributions to third parties. Thus, in spite of HP Financial's failure to pursue its rights by seeking a stay, we elect to consider the merits of the valuation issue.

As to the issue of sanctions, no third-party rights are implicated. We therefore consider the merits of that issue below.

B. Valuation of the Indigo 5500

The proper standard for valuation in this context is replacement value. Associates Commercial Corp. v. Rash, 520 U.S. 953, 956 (1997). Replacement value is defined as "the cost the debtor would incur to obtain a like asset" for the same use. Id.

The bankruptcy court had before it two kinds of evidence bearing on this question. The Debtor presented evidence of the prices paid by other customers of HP Financial who had elected to purchase equivalent equipment at the end of their "lease" terms. HP Financial presented evidence of value in the form of expert appraisal testimony by Mr. Hjelmstrom. The bankruptcy court as trier of fact concluded that the prior lease buyouts provided better evidence of value than the appraisal. Based on the evidence of the most recent lease buyouts provided, the bankruptcy court determined the value of the Indigo 5500 to be approximately $45,000. But because the Debtor had already proposed to pay HP Financial $90,000 in the Plan, the bankruptcy court concluded that the Debtor was "stuck with" that amount.

An examination of the entire record before the bankruptcy court, including portions of the Confirmation Hearing transcript omitted from HP Financial's record on appeal, provided evidence

21

to support the bankruptcy court's value determination. On cross-examination, Mr. Hjelmstrom admitted that he had neither inspected the Indigo 5500 nor considered any of the lease buyouts presented by the Debtor. Indeed, Mr. Hjelmstrom stated that he had not considered any actual sales of equipment similar to the Indigo 5500 in making his appraisal. The bankruptcy court further took issue with Mr. Hjelmstrom's use of a refurbished value as the baseline from which he began his analysis. Although Mr. Hjelmstrom testified that he reduced the refurbished value by twenty percent to account for the fact that the Indigo 5500 was not refurbished, the bankruptcy court did not clearly err in finding that the value given was still too high, particularly in light of the evidence showing much lower prices obtained from actual sales. Additionally, Mr. Hjelmstrom acknowledged on cross-examination that the Indigo 5500 was no longer in production, but he made no adjustment to account for the prospect of obsolescence in the future.

On this record, we can neither conclude that the bankruptcy court clearly erred in its valuation, nor that the court abused its discretion in confirming the Plan with its provision to pay HP Financial $90,000, plus interest at six percent per annum, for the Indigo 5500.

C.    Sanctions

The Debtor requested sanctions in both Motions to Compel, and the bankruptcy court awarded sanctions in the form of attorney fees in its Second Discovery Order. The amount of those sanctions was determined in a separate Fee Order. HP Financial takes issue both with the imposition of sanctions and with the

22

amount awarded.

## 1. Imposition of sanctions was not an abuse of discretion

Civil Rule 37(a)(5), made applicable by Rule 7037, requires the court to award attorney fees to a movant where a party's failure to respond to discovery necessitated a motion to compel. Such sanctions are not awarded if the moving party resorted to a motion to compel without first making a good-faith effort to obtain discovery through ordinary means; if the opposing party's nonresponse was substantially justified; or if circumstances otherwise make an award of sanctions unjust. Civil Rule 37(a)(5)(A). An evasive or incomplete response to discovery requests is equivalent to a failure to respond. Civil Rule 37(a)(4). Absent a motion for a protective order, the fact that a discovery request is objectionable is no excuse for a lack of response. Civil Rule 37(d)(2).

In response to the first round of document requests, HP Financial produced a single document, the Master Agreement itself, which was already in the Debtor's possession. Similarly, HP Financial's responses to Debtor's first set of interrogatories were largely evasive and incomplete. In some cases HP Financial simply did not respond, other than to make a boilerplate objection. After the hearing on the First Motion to Compel, at which the bankruptcy court required additional responses, HP Financial provided no further responses whatsoever by the deadline stated on the record at the hearing and later incorporated into the First Discovery Order. HP Financial eventually provided supplemental responses, but other information was furnished only after the Second Motion to Compel was filed

23

and the Second Discovery Order was entered.  Still other information was never provided at all.

          a.    <u>The court did not commit reversible error in requiring HP Financial to provide documents in the custody of HP Inc. and Indigo America</u>

With respect to some of the requested documents and information, HP Financial has maintained both in the bankruptcy court and now on appeal that the information, which was held either by HP Inc. or by Indigo America, was not in the possession, custody or control of HP Financial.

In the related context of Civil Rule 45, the Ninth Circuit has held that a party has "control" over documents that it has a legal right to obtain on demand.  <u>In re Citric Acid Litigation</u>, 191 F.3d 1090, 1107 (9th Cir. 1999).  The Ninth Circuit stated that its <u>Citric Acid</u> decision was consistent with the decisions of other circuits on this question, including the Third Circuit's decision in <u>Gerling Int'l Ins. Co. v. Comm'r</u>, 839 F.2d 131 (3d Cir. 1988).  The Third Circuit in <u>Gerling</u> explained that, where a litigating subsidiary acting as the agent of its parent company has access to the parent company's documents for its own business purposes, the subsidiary cannot deny control for purposes of litigation.  <u>Gerling Int'l Ins. Co.</u>, 839 F.2d at 141.  <u>See also</u> <u>Cooper Industries v. British Aerospace Corp.</u>, 102 F.R.D. 918, 919 (S.D.N.Y. 1984) ("inconceivable" that subsidiary lacked control over parent's materials relevant to its business of marketing and servicing parent's aircraft).

There is no dispute that both HP Financial and Indigo America are subsidiaries of HP Inc.  The record amply supports

24

the conclusion that HP Financial, as the in-house financing unit of HP Inc., had access to documents possessed by HP Inc. relating to the very equipment that HP Financial finances on a daily basis. We perceive no error in the bankruptcy court's decision to require production by HP Financial of relevant documents in its affiliates' possession.

HP Financial does not argue that it suffered any prejudice or harm as a result of the bankruptcy court's requirement that these documents be produced. Even if we were to hold that this determination by the bankruptcy court was erroneous, the error would be harmless and therefore not reversible. Van Zandt v. Mbunda (In re Mbunda), 484 B.R. 344, 355 (9th Cir. BAP 2012), aff'd, 2015 WL 1619469 (9th Cir. Apr. 13, 2015) (no reversal for harmless error).

> b. The court did not abuse its discretion overruling HP Financial's other objections

HP Financial also objected to various discovery requests on the grounds that the requested information was not relevant and that the requests were unduly burdensome. None of these objections was meritorious, and the bankruptcy court did not abuse its discretion in imposing sanctions over HP Financial's objections.

The requested materials were highly relevant to the underlying dispute regarding the nature of the Master Agreement and the value of the Indigo 5500. The discovery requests at issue sought information regarding similar equipment and similar transactions with other putative lessees. As noted above, the bankruptcy court properly relied on admitted evidence of this

25

type in making its factual findings. We perceive no abuse of discretion in requiring production of this relevant information.

As to the objections regarding burdensomeness, even though HP Financial never moved for a protective order, the court dealt with the issue during the hearings on both Motions to Compel. The bankruptcy court made it clear during colloquy that HP Financial was not expected to dedicate "thousands of hours" to locating the requested documents, and that a more modest volume of production would be acceptable. HP Financial appears to argue, on appeal as well as before the bankruptcy court, that it should not have been required to produce **anything** in response to these requests merely because it objected on the grounds of burdensomeness.

Civil Rule 26(b)(2)(C), which provides that electronically stored information need not be produced if the responding party shows the information is not "reasonably accessible," does not support HP Financial's argument. HP Financial asserted that the information regarding prior leases was unavailable due to undue burden or cost, but the bankruptcy court did not find this assertion credible. In fact, at least some of this information ultimately was produced and was presented as evidence at the Confirmation Hearing. The bankruptcy court did not abuse its discretion in requiring production of this relevant information.

2. The amount of sanctions was not reversible error

    a. The bankruptcy court did not abuse its discretion in awarding attorney fees for both Motions to Compel

LBR 7026-1 requires a party seeking discovery to follow

26

certain procedures before filing a motion to compel. Specifically, the moving party must first arrange a meeting of counsel in a good faith effort to resolve any discovery dispute. Seven days after requesting such a meeting, the moving party may file and serve a stipulation by the parties explaining the unresolvable discovery dispute or a declaration of non-cooperation by the opposing party. Only then is a party to file a motion to compel discovery. LBR 7026-1(c)(3). Failure of counsel to cooperate in this procedure is grounds for imposition of sanctions. LBR 7026-1(c)(4).

The Debtor filed the First Motion to Compel without waiting the full seven days after requesting a meeting of counsel and without filing the required stipulation. Debtor's counsel argued at that time that his failure to follow the steps set out in LBR 7026-1 was justified, as the Confirmation Hearing was fast approaching and the discovery dispute was unlikely to be resolved in time. The court, however, concluded that LBR 7026-1 did not permit the imposition of sanctions absent strict compliance with its local rule. Nevertheless, the denial of the sanctions request was without prejudice.

The Second Motion to Compel was filed after meetings of counsel had been arranged and concluded in an effort to resolve the ongoing discovery disputes. Debtor's counsel also filed, together with the Second Motion to Compel, a declaration explaining that he had been unable to obtain the cooperation of counsel for HP Financial in preparing the required stipulation. In the Second Discovery Order, the court awarded attorney fees incurred in prosecuting both Motions to Compel. The original

27

denial, without prejudice, of the sanctions request did not foreclose this award.  The record before the bankruptcy court was sufficient to establish not only that HP Financial had failed to comply with discovery, but also that counsel for HP Financial had not cooperated reasonably with Debtor's counsel's attempts to resolve the discovery dispute.  The award of sanctions for both motions did not constitute an abuse of discretion.

> b.    Entry of the Fee Order before HP Financial filed its objection to the Fee Declaration was not reversible error

Finally, HP Financial argues that the bankruptcy court abused its discretion by entering the Fee Order before the expiration of the objection period following the filing of the Fee Declaration.  According to the Second Discovery Order, HP Financial was to have "two calendar weeks" in which to file any objection to the Fee Declaration.  In fact, the bankruptcy court entered the Fee Order on the fourteenth day after the Fee Declaration was filed.  HP Financial filed an objection to the Fee Declaration later the same day in the evening.

Although the Fee Order appears to have been entered technically in violation of the Second Discovery Order, this violation was remedied when the bankruptcy court considered and denied the Second and Third Motions to Alter.  Wade v. State Bar of Arizona (In re Wade), 948 F.2d 1122, 1125 (9th Cir. 1991) (no due process violation when order was entered before response deadline if party had meaningful opportunity to respond in reconsideration motion).  In filing those motions, HP Financial had a meaningful opportunity to raise its objections to the Fee

28

Declaration. The bankruptcy court considered and rejected these objections. We perceive no abuse of discretion in this decision. Moreover, HP Financial's arguments regarding the substance of the Fee Order are so insubstantial as not to warrant further proceedings before the bankruptcy court.[8]

## VI. CONCLUSION

Based on the foregoing, because the bankruptcy court did not clearly err in its valuation of the Indigo 5500, we conclude that it did not abuse its discretion in approving the Plan provision requiring the Debtor to pay HP Financial $90,000 on its secured claim. The bankruptcy court's award of sanctions also was not an abuse of discretion. We DISMISS AS EQUITABLY MOOT the aspects of the appeal concerning confirmation of the Plan generally and the nature of the Master Agreement. On the issues of sanctions and the valuation of the Indigo 5500, we AFFIRM.

---

[8]In fact, the Debtor argues, as an alternative basis for affirmance, that the bankruptcy court should have imposed terminating sanctions. As no cross-appeal was filed, this issue is not properly before us, but we note that the sanctions actually imposed were intermediate between the parties' respective positions.

29